Harvey Joe SANNER, et al., Plaintiffs,

v.

**THE BOARD OF TRADE OF THE CITY OF CHICAGO, et al., Defendants.**

**No. 89 C 8467.**

United States District Court,
N.D. Illinois,
Eastern Division.

July 8, 1998.

Steve Alexander, John F. Arens, Arens & Alexander, Fayetteville, AR, Patrick F. Daly, Palos Heights, IL, Thomas Edward Johnson, Anne Megan Davis, Johnson, Jones, Snelling & Gilbert, Chicago, IL, Peter F. Langrock, Langrock, Sperry & Wool, Middlebury, VT, for Plaintiffs.

Christopher Alan Hostage, Terrence Gilroy Reed, Reed & Hostage, P.C., Washington, DC, for Warren D. Jones.

Garrett B. Johnson, Jeffrey L. Willian, Kirkland & Ellis, Chicago, IL, for Defendants.

Adam P. Merrill, Kirkland & Ellis, Chicago, IL, for Board of Trade of City of Chicago.

### MEMORANDUM OPINION AND ORDER

LEVIN, United States Magistrate Judge.

Presently pending before this court is Plaintiffs' motion to compel. For the reasons set forth below, this court grants the motion in part and denies it in part.

### RELEVANT BACKGROUND

Plaintiff farmers allegedly sold soybeans at prices illegally depressed by the actions of the Chicago Board of Trade ("CBOT") and twenty-six of its officers and employees. Plaintiffs assert that CBOT manipulated the price of soybeans by issuing an Emergency Resolution on July 11, 1989 ("the Resolution") which required immediate liquidations of large positions in the July 1989 soybean futures contract. Plaintiffs presently have

claims against Defendants for violations of federal antitrust law.

### PLAINTIFFS' MOTION TO COMPEL

The parties conducted document discovery between early 1997 and early 1998. In conjunction with this discovery, Plaintiffs' counsel reviewed documents made available by Defendants' counsel. On April 20, 1998, Plaintiffs' counsel marked particular documents that they wanted Defendants' attorney to copy and send to Plaintiffs. Plaintiffs' counsel received certain copied documents from Defendants' attorneys but never received certain other requested documents. In a letter to Plaintiffs' attorneys dated April 29, 1998, Defendants' attorneys asserted that the missing documents—later identified by Defendants as: (1) notes of Terrance K. Livingston, counsel to CBOT at the time of the Resolution and (2) notes taken by Wallace G. Weisenborn, Chairman of the Business Conduct Committee of the CBOT at the time of the Resolution—were "privileged documents that were inadvertently included in the documents [Plaintiffs' attorney] inspected." (Def.Resp.Ex. 5.) Subsequently, Defendants tendered a privilege log which included the above documents.

Plaintiffs now seek to compel production of the two sets of documents. Plaintiffs argue that the documents contain no privilege and, even if they do, Defendants waived any privilege.

### ANALYSIS

The court in *Harmony Gold U.S.A., Inc. v. FASA Corp.*, 169 F.R.D. 113, 115 (N.D.Ill. 1996) set forth the approach to a court's review of claims of inadvertent production of privileged material:

In ruling on motions involving inadvertent production of claimed privileged documents, the court undertakes a three-part inquiry. As a threshold matter, the court must determine whether the disputed document is indeed [privileged]. If the document is not privileged, the inquiry ends. If the document is privileged, the court must then determine if the disclosure was inadvertent. Lastly, even if the document is found to be [privileged] and inadvertently produced, the court must, nonetheless, determine whether privilege was waived.

### I. ARE THE DOCUMENTS PRIVILEGED?

As a threshold matter, this court will determine whether the disputed documents here contain privileged information.

### A. THE NOTES OF WALLACE WEISENBORN.

■ These documents (bates nos. 014178–014182) consist of notes allegedly taken by Wallace Weisenborn ("Weisenborn"), Chairman of the BCC.[1] In an affidavit, Weisenborn states, with respect to these documents:

In early July, I consulted with CBOT General Counsel, Scott Early, on numerous occasions regarding the BCC's role in the developing Ferruzzi situation. CBOT counsel guided me with respect to the duties of the BCC and various tools available to the BCC to ensure an orderly liquidation of the positions in the July futures contract. In considering the options of the BCC in light of the developing Ferruzzi situation, I created the notes identified in the current action as Bates Numbers 014178–014182. These notes incorporate the attorney advice I received as Chairman of the BCC.

(Def. Reply Ex. 1 ¶ 10.) Defendants state that Weisenborn's notes summarize and incorporate his requests for legal advice and the attorney advice he received and are, therefore, protected by the attorney-client privilege.

■ Upon this court's *in camera* review of the documents at issue, this court disagrees with Defendants that Weisenborn's notes contain material protected by the attorney-client privilege. The Seventh Circuit has set

---

1. Plaintiffs' counsel, based largely on their own lay handwriting comparisons, contend that these documents were different sets of notes of the same conversation written by different authors. However, Weisenborn states by sworn affidavit that he created the notes. (*See* Defs. Resp. Ex. 1 ¶ 10.) Thus, absent concrete evidence rebutting Weisenborn's sworn affidavit, this court must reject Plaintiffs' authorship contention.

forth that the attorney-client privilege applies as follows:

> (1) Where legal advice of any kind is sought, (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection may be waived.

*United States v. Evans*, 113 F.3d 1457, 1461 (7th Cir.1997) (citations omitted). The attorney-client privilege protects confidential communications between an attorney and his client made for the purpose of obtaining legal advice. *United States v. Lawless*, 709 F.2d 485, 487 (7th Cir.1983).

At the threshold here, this court's review of the Weisenborn notes does not disclose any legal advice. Among other things, the notes do not mention anything about attorneys or communications from attorneys. Although Weisenborn's affidavit generally states that at some point "in early July" he consulted with CBOT's counsel, he does not in any way connect any of the undated notes at issue to any particular conversation with counsel nor identify the circumstances under which the notes were authored. Also, Defendants have not made any showing that the asserted communications were confidential. Under these circumstances, this court finds that Weisenborn's notes are not protected by the attorney-client privilege.

**B. *THE LIVINGSTON NOTES OF THE JULY 5, 1988 BCC MEETING.***

■ According to Defendants, documents marked as bates nos. 012819–25 consist of notes taken by Terrance Livingston ("Livingston") at a July 5, 1989 meeting of the Business Conduct Committee of the CBOT (the "BCC"). Livingston was counsel to the CBOT's Office of Investigation and Audits at the time of the meeting.[2] Among other duties, Livingston was "asked from time to time to participate in litigation in which the CBOT was or could reasonably be expected to become involved." (Defs. Resp. Ex. 2 ¶ 2.)

Defendants argue that these notes contain privileged work product. According to Livingston, at the time of the July 5 meeting, he recognized that the possibility that the BCC would recommend that the Board of the CBOT take emergency action (*see* footnote 2) was increasing. (Defs. Resp. Ex. 2 ¶ 7.) Livingston's affidavit states that he "believed that any emergency action by the CBOT would likely be the subject of litigation," especially in light of the fact that similar earlier emergency action spawned decade long litigation. (*Id.*) Defendants assert that Livingston's notes—which they characterize as mental impressions and thought processes—are work product because they were created in preparation for anticipated litigation.

Plaintiffs contest Defendants work product privilege claim with respect to Livingston's July 5 meeting notes.[3] Plaintiffs contend that Livingston did not prepare those notes "in anticipation of litigation," as required for work product protection under Fed.R.Civ.P. 26(b)(3). *See Binks Mfg. Co. v. National Presto Indus., Inc.*, 709 F.2d 1109, 1118–19 (7th Cir.1983). Plaintiffs assert that the July 5 notes make no mention of litigation and

---

**2.** At the July 5 meeting, the BCC met with representatives from Ferruzzi Finanzaria S.p.A. ("Ferruzzi"). According to Defendants, the BCC, concerned that Ferruzzi was attempting to manipulate or distort the price of the 1989 soybean futures contract, urged Ferruzzi representatives at the July 5 meeting to liquidate their July futures positions in an orderly fashion. (Defs. Resp. Ex. 1 ¶ 7, Ex. 2 ¶ 7.) When Ferruzzi failed to abide by this request, the BCC recommended that the CBOT's Board of Directors take emergency action. (*Id.* Ex. 1 ¶ 8.) On July 11, the CBOT's Board met and adopted a Resolution ordering any entity holding more than the three million bushel speculative limit to reduce its positions by twenty percent each day and prohibit-

ing any entity from holding positions in excess of three million bushels by July 18. (*Id.* Ex. 1 ¶ 9, Ex. 2 ¶ 9.) On July 13, 1989, Ferruzzi filed suit in federal court seeking a temporary restraining order and preliminary and permanent injunction to prevent the enforcement of the CBOT's order. (*Id.* Ex. 1 ¶ 10.) The subject emergency resolution also precipitated other subsequent federal court actions. (*Id.* Ex. 1 ¶ 12.)

**3.** Plaintiffs do not contest Defendants' assertion of privilege with respect to other notes allegedly written by Livingston (bates nos. 012826–32) which, Plaintiffs state, "are not the subject of this motion to compel." (Pls. Reply at 18.)

that any potential litigation at the time of the July 5th meeting was contingent on future events—if the BCC instructed Ferruzzi to take action, then Ferruzzi declined, and then if emergency action was taken, there would be a prospect for litigation. Plaintiffs contend that Livingston's July 5 notes were merely prepared in the ordinary course of business and are simply factual accounts of nonprivileged conversations.

■ In order to invoke the protection of the work product privilege, a party must demonstrate that the material sought to be protected were prepared "in anticipation of litigation." *Binks Mfg. Co. v. National Presto Indus., Inc.*, 709 F.2d 1109, 1118 (7th Cir.1983). In making this determination, a court must determine whether, in light of the factual context, "the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *Id.* at 1119 (quoting *Diversified Industries, Inc. v. Meredith*, 572 F.2d 596, 604 (8th Cir.1977)). "The mere fact that litigation does eventually ensue does not, by itself, cloak materials ... with the work product privilege; the privilege is not that broad." *Id.* at 1118. Nor does the work product rule come into play because there is a "remote prospect of future litigation." *Id.* Rather, "the primary motivating purpose behind the creation of a document or investigative report must be to aid in possible future litigation." *Id.* at 1119 (quoting *Janicker v. George Washington University*, 94 F.R.D. 648, 650 (D.D.C.1982)). The court must distinguish between materials "developed in the ordinary course of business" as a precaution for the "remote prospect of litigation" and materials prepared because "some articulable claim, likely to lead to litigation ... ha[s] arisen." *Id.* at 1120 (citations omitted).

Applying the above standards here, this court finds that the Livingston notes contain privileged work product. This court's review of Livingston's affidavit discloses that Livingston prepared his July 5 notes because of the likely prospect of litigation with Ferruzzi. Livingston's affidavit states that the July 5

notes "reflect [his] impressions of information that might prove relevant to the representation of the CBOT in any ensuing litigation, which [he] concluded was probable" if Ferruzzi did not immediately substantially reduce or liquidate its July futures positions. (Defs. Resp. Ex. 2 ¶ 7.) Under these circumstances, the court finds that the prospect of litigation was not remote and that Livingston's July 5 notes were generated because "some articulable claim, likely to lead to litigation ... had arisen." Put differently, Defendants have adequately established that the "primary motivating purpose" behind preparation of the subject notes was to "aid in possible future litigation."

## II. WAS THE PRIVILEGE WAIVED BY INADVERTENT DISCLOSURE?

Having concluded that the Livingston notes contain privileged work product, this court must next consider whether Defendants inadvertently produced these documents and, even if so, whether the privilege was waived. *See Harmony Gold*, 169 F.R.D. at 115.

### A. WAS THE INITIAL DISCLOSURE INADVERTENT?

■ This court must initially determine whether Defendants inadvertently disclosed the disputed documents. In determining whether a party inadvertently produced a document, courts look at the circumstances surrounding the disclosure. *See, e.g., Harmony Gold*, 169 F.R.D. at 116.

The circumstances involved here are as follows: (1) well over twenty thousand documents were under review for production from Defendants to Plaintiffs; (2) prior to production, Defendants' counsel attached a "pink sheet" to the documents at issue marking such documents as privileged, *see* Defs. Resp. Ex. 3 ¶ 6, Ex. 4 ¶ 6;[4] (3) although Defendants' counsel instructed his staff to remove all documents marked with "pink sheets" from the documents to be produced, *see id.* Ex. 3 ¶ 5, Ex. 4 ¶ 5, Defendants' counsel discovered—after Plaintiffs' counsel

---

4. The parties dispute whether the documents at issue were marked "PRIVILEGED" with a red stamp.

inspected the documents at issue here and requested copies of them—that a staff member had inadvertently left the documents at issue in the boxes Plaintiffs' counsel had inspected, *id.* Ex. 3 ¶ 12, Ex. 4 ¶ 11; (4) upon recognizing the error, the staff member removed the privileged documents from the copies that were eventually sent to Plaintiffs, *id.* Ex. 3 ¶ 12, Ex. 4 ¶ 11; and (5) by letter to Plaintiffs' attorneys dated April 29, 1998, Defendants' attorneys asserted that the documents were "privileged documents that were inadvertently included in the documents [Plaintiffs' attorney] inspected," *see* Defs. Resp. Ex. 5.

Considering these circumstances, especially in light of the fact that 22,500 documents were produced to Plaintiffs for inspection, *see* Defs. Resp. Ex. 4 ¶ 7, this court finds that Defendants' production of the documents at issue was inadvertent.

### B. *DID INADVERTENT PRODUCTION WAIVE THE PRIVILEGE?*

■ The Seventh Circuit has not definitively held whether inadvertent disclosure of privileged information waives privilege but has said that "[c]ourts are somewhat less likely to find waiver in such a case." *Dellwood Farms, Inc. v. Cargill,* 128 F.3d 1122, 1126 (7th Cir.1997) (citing cases). Lower courts in this district have taken three approaches: (1) holding that nearly any disclosure of the communication waives the privilege;[5] (2) holding that unintentional disclosure cannot waive the privilege;[6] and (3) deciding pursuant to a case-by-case balancing test whether the circumstances of the inadvertent disclosure warrant a finding that the privilege has been waived.[7]

■ After considering the various analyses, this court adopts in this case the balancing test which appears to be an emerging test of courts in this district (*see* footnote 7). Under this balancing test, a court weighs: (1) the reasonableness of the precautions taken to prevent the disclosure, (2) the time taken to rectify the error, (3) the scope of the discovery, (4) the extent of the disclosure, and (5) the overriding issue of fairness. *See, e.g., Central Die Casting & Mfg. Co., Inc. v. Tokheim Corp.,* No. 93 C 7692, 1994 WL 444796, at *4 (N.D.Ill. Aug. 15, 1994).

Applying this balancing test, this court finds that Defendants' inadvertent production did not waive the privilege. First, the court finds that the precautions taken by Defendants' counsel to prevent disclosure, discussed *supra,* were reasonable. Additionally, the court finds that Defendants acted immediately (and sufficiently) upon discovering the production error by withdrawing the documents from the production prior to sending copies to Plaintiffs and by promptly asserting the inadvertent disclosure by letter. The overriding issue of fairness, and the extent of the disclosure, do not weigh against Defendants here.

### CONCLUSION

In view of the foregoing, Plaintiffs' motion to compel is granted in part and denied in part. Defendants are ordered to produce copies of the documents bates marked nos. 014178–82 to Plaintiffs within fourteen (14) days from the date of this order.

---

**5.** *See, e.g., Harmony Gold U.S.A., Inc. v. FASA Corp.,* 169 F.R.D. 113, 117 (N.D.Ill.1996) (Bobrick, M.J.).

**6.** *See, e.g., Mendenhall v. Barber–Greene Co.,* 531 F.Supp. 951, 954 (N.D.Ill.1982) (Shadur, D.J.); *Harris Corp. v. Amperex Elec. Corp.,* No. 86 C 6338, 1987 WL 4847, at *2 (N.D.Ill. May 15, 1987) (Rosemond, M.J.); *Winston Network, Inc. v. Indiana Harbor Belt R.R. Co.,* No. 88 C 4473, 1989 WL 112725, at *2–3 (N.D.Ill. Sept. 19, 1989) (Conlon, D.J.); *Wieboldt Stores, Inc. v. Schottenstein,* No. 87 C 8111, 1991 WL 105633, at *4 (N.D.Ill. June 7, 1991) (Holderman, D.J.).

**7.** *See, e.g., Lien v. Wilson & McIlvaine,* No. 87 C 6397, 1988 WL 58613, at *1 (N.D.Ill. June 2, 1988) (Lefkow, M.J.); *Central Die Casting & Mfg. Co., Inc. v. Tokheim Corp.,* No. 93 C 7692, 1994 WL 444796, at *4 (N.D.Ill. Aug. 15, 1994) (Williams, D.J.); *Graco Children's Prods. v. Dressler, Goldsmith, Shore & Milnamow, Ltd.,* No. 95 C 1303, 1995 WL 360590, at *7 (N.D.Ill. June 14, 1995) (Anderson, D.J.); *International Oil, Chem. & Atomic Workers v. Uno–Ven Co.,* No. 97 C 2663, 1998 WL 100264, at *2–3 (N.D.Ill. ·Feb. 23, 1998) (Lindberg, D.J.).